COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Judges Athey, Fulton* and Lorish
Argued at Fairfax, Virginia


JAEYOUNG LEE

                                                    OPINION BY
v.        Record No. 0547-24-4          JUDGE CLIFFORD L. ATHEY, JR.
                                              JANUARY 13, 2026

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Randy I. Bellows, Judge[1]

Catherine French Zagurskie, Chief Appellate Counsel (Virginia
Indigent Defense Commission, on briefs), for appellant.

Timothy J. Huffstutter, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.

Amicus Curiae: Virginia Association of Criminal Defense Lawyers
(Aaron L. Cook; Robert W. Loftin; Thomas E. Spahn; Matthew T.
Butler; Maya Ravindran; McGuireWoods, LLP, on brief), for
appellant.


        Following a jury trial held in the Circuit Court of Fairfax County ("trial court"), Jaeyoung

Lee ("Lee") was convicted of: 1) aggravated malicious wounding; 2) wiretapping; 3) possession

of burglary tools; 4) use of a firearm in the commission of a felony; 5) personal trespass by

computer; and 6) two counts of computer invasion of privacy.  He was subsequently sentenced to

life in prison plus 48 years.  On appeal, Lee assigns error to the rulings of the trial court for 1)

admitting in evidence his notebook in violation of the attorney-client privilege and work-product

---

        * Justice Fulton participated in the hearing and decision of this case prior to his
investiture as a Justice of the Supreme Court of Virginia.

        [1] The Hon. Dontaè L. Bugg presided over the pre-trial motions and trial, and the Hon.
Randy I. Bellows presided over the post-trial motions and sentencing.

doctrine; 2) failing to hold his sentencing and post-trial motions hearings before the circuit court judge who presided over his jury trial; 3) admitting into evidence his refusal to comply with a search warrant seeking to obtain a sample of his DNA; and 4) giving an instruction to the jury regarding the previous admission in evidence of his refusal to comply with the search warrant seeking a sample of his DNA. For the following reasons, we affirm Lee's convictions.

## I. BACKGROUND[2]

In 2020, Lee was charged with two counts of computer invasion of privacy in violation of Code § 18.2-152.5:1, wiretapping in violation of Code § 19.2-62(2), possession of burglary tools in violation of Code § 18.2-94, aggravated malicious wounding in violation of Code § 18.2-51.2, use of a firearm in commission of a felony in violation of Code § 18.2-53.1, and personal trespass by computer in violation of Code § 18.2-152.7(B).[3]

On October 12, 2021, the parties were informed that Judge Dontaè L. Bugg had been assigned to the case. Lee's jury trial commenced on April 25, 2023. Following voir dire, the jury was empaneled, and the parties presented their opening statements. The Commonwealth's evidence during its case-in-chief demonstrated that in 2016, Lee and Jennifer Mills ("Mills") began a romantic relationship but then broke up shortly thereafter before getting back together in the spring of 2017. Mills testified that in September of 2017, she once again ended her romantic relationship with Lee; however, Lee attempted to reconcile multiple times through emails, letters, and unannounced visits to Mills's apartment. Also, during the period from April to November of 2017, Mills noticed unusual activity on her Facebook and Gmail accounts

---

[2] "We consider the evidence and all reasonable inferences fairly deducible therefrom in the light most favorable to the Commonwealth, the prevailing party at trial." *Logan v. Commonwealth*, 299 Va. 741, 745 (2021) (quoting *Crawford v. Commonwealth*, 281 Va. 84, 97 (2011)).

[3] The Commonwealth moved to have all the charges heard at a single trial, which was granted.

including many of her male friends being deleted from her Facebook friends list and some of her contacts being blocked in her Gmail account, including one of her male friends, Austin Scott ("Scott").

In addition, a series of Facebook messages between Lee and Scott were also entered in evidence. In one of the messages from October 20, 2017, Lee had asked Scott if Mills had been romantically involved with Scott during Lee and Mills's relationship. In response, Scott emailed Lee that Scott and Mills were only friends. Lee still asked Scott to "disengage with her while she sorts her problems out." Mills's sister Jessica Mills ("Jessica") also testified that in October of 2017, Lee contacted her via email and stated that he had "screwed up royally" in his relationship with Mills. Lee further told Jessica that he was "lost without [Mills]" and that he "still love[d] her." Jessica summarized the messages for the jury as Lee "hoping that [she] would have some answers, and how devastated he was that [Mills] had broken up with him."

During Mills's testimony, she also stated that on October 21, 2017, she and J.T.,[4] a co-worker, had spent the day together. She further testified that they were alone at J.T.'s townhouse that night and the doorbell rang. J.T. went to answer the door. Upon hearing a "thud," Mills went upstairs and saw that J.T. was lying near the front door, having been shot multiple times. Mills testified that she had not heard any gunfire, only the thud. 911 was called, and Officer Scott Cole and Detective Sarah Tran of the Fairfax County Police Department ("FCPD") responded, detailing the multiple bullet holes in the windows of the townhouse, no sign of forced entry into the home, and no shell casings outside in the grass. Julie Ray, an EMT, also testified that emergency medical services responded and were able to stabilize J.T.'s life-threatening injuries until he was transported to the hospital.

---

[4] We use initials to protect the victim's privacy.

J.T.'s trauma surgeon, Dr. Elizabeth Franco, testified that J.T. had incurred permanent injuries to his brain and internal organs and that these severe and debilitating injuries required approximately 30 surgeries to repair.[5]  J.T.'s supervisor, Shane Healey ("Healey"), also testified that J.T. worked as a government contractor.  Healey noted that J.T. did not have any known personal problems, such as gambling, excessive debt, or a criminal history, and a co-worker, Kevin Bryan, testified that J.T.'s work did not create a security threat.

William Stull ("Stull") also testified that he knew Lee from their time together working for the Department of Defense.  Stull further testified that he saw Lee in a restaurant on October 23, 2017, and Lee spoke to Stull about the shooting.  According to Lee, on the day of the shooting, Lee was not feeling well, had a shot of whiskey, went to McDonald's, then went to bed.  Lee also told Stull in phone calls that when Lee allegedly went to McDonald's on the night of the shooting, the key fob to the apartment complex's parking garage was broken, so he used the emergency exit stairwell so "they'll see him leaving, but they won't see him return."  Lee also told Stull that he went to McDonald's but did not go to the location closest to his apartment complex and that Lee arrived at McDonald's without his wallet, so he returned to the apartment. But Lee told Stull that when he went back to McDonald's with his wallet, he decided not to purchase anything.  Lee also advised Stull that he had "a lot on his mind" the day after the shooting and had gone hiking in Douthat State Park.

The day after the shooting, Detective Jon Long ("Detective Long") of the FCPD directed Mills to call Lee, and Detective Long recorded the phone call, a copy of which was introduced in evidence at trial.  During the recorded phone call with Mills, Lee denied any involvement with the shooting and said he had been hiking in the Shenandoah Valley.  On October 24, 2017, Detective Long also called Lee.  Although Lee declined to be voluntarily interviewed by police,

---

[5] Lee noted during the trial that he was not contesting the severity of J.T.'s injuries.

stating that command in the Navy had advised him not to be interviewed, Lee later admitted over the phone to Stull that Navy command had not said anything to him about it.[6]

On October 25, 2017, Lee contacted attorney John Ellis ("Ellis"), informing him of the ongoing investigation into the shooting. Ellis sent Lee a representation agreement the same day, and Lee told Ellis that he was going to hire him. Ellis testified that he gave Lee "some things to think about" and encouraged him to "build a timeline on . . . where he might have been during the time of the shooting." Ellis further testified that he "never directed [Lee] to write a journal" or to "take notes or work in any particular way." The representation agreement that Ellis sent to Lee stated that Ellis's law firm "will be happy to provide [Lee] with representation during the Fairfax County Police investigation into a shooting that occurred in . . . Fairfax County" and clarified that the agreement was only for the investigation, noting that if Lee was "ever charged with a crime, a separate agreement [would] need to be negotiated."

On October 27, 2017, Lee met with the Naval Criminal Investigative Service to be interviewed by detectives from the FCPD, but upon arriving there, Lee informed the detectives that he was represented by counsel and would not make any statements. Ellis testified that on October 30, 2017, Lee paid to retain Ellis concerning the investigation. Ellis also testified that on October 31, 2017, Ellis and Lee met to discuss the case, and Lee brought his notebook along with him, but Ellis "never looked in it." Ellis testified that he told Lee that "at some point he[] [Lee] [is] likely to be subject to a search warrant," including his personal belongings and effects, and instructed Lee to label the notebook as "'attorney-client information' in order to protect it."

Both Detective Craig Guyton and Lieutenant Matthew Luik testified that members of the FCPD executed a warrant on November 1, 2017, to search Lee's apartment and further secured his vehicle. During the execution of the search warrant, police located a rifle, shell casings, and

---

[6] During this time, Lee was an active-duty member of the United States Navy.

electronic storage devices.[7]  On November 3, 2017, police executed a second search warrant on a 2012 Chevy Cruze registered to Lee.  Inside the vehicle, Detective James Lopez ("Detective Lopez") testified that he located a loaded rifle magazine, ammunition, and a notebook labeled "Attorney Client Privileged Information."  Detective Lopez testified that he gave the notebook to Detective Long, who consulted with a prosecutor and made copies of the contents of the notebook.

Through additional search warrants, Detectives Lopez, Jesse Katzman, and John Spata ("Spata") of the FCPD executed another search of Lee's apartment, locating more ammunition, USB drives, lockpicking tools, locks, and an empty Google Nest camera box.  There were also sample locks in Lee's apartment that matched the locks on the door to Mills's apartment, and police also located a box for a firearm suppressor and a receipt.[8]

Detective Long further testified that on January 10, 2018, he executed a search warrant to obtain Lee's DNA and that Lee "declined to provide" a DNA sample.  Spata testified that Lee was "disinterested" with the search warrant.  When Detective Long attempted to execute the search warrant again on January 22, 2018, Lee complied.[9]

During Mills's testimony, she further testified that she located a Google Nest camera in her apartment under her television stand and subsequently called the FCPD to report her

---

[7] Bronwyn McMaster ("McMaster"), a forensic scientist who specialized in firearms and toolmarks, examined a rifle and a lower receiver from Lee's apartment, as well as a bullet fragment from the crime scene.  She explained that the bullet fragment was consistent with a .223 Remington or a 5.56mm caliber but could not say if it was fired from the rifle.  She also could not compare ammunition to just the lower receiver, as there was no barrel for comparison. She testified that a rifle chambered in 5.56mm caliber could also fire .223 caliber ammunition.

[8] Grant Pinto, a firearms dealer, testified that he had sold a suppressor in 5.56mm caliber to Lee on April 26, 2016.

[9] On October 4, 2021, the Commonwealth filed a motion *in limine* to admit evidence of Lee's refusal to comply with a search warrant for Lee's DNA, which was granted.

discovery on January 28, 2018. She told law enforcement that she had not installed the camera and had not given anyone permission to install it. Kelly Loynes and Angie Rainey, forensic scientists employed by the Department of Forensic Science, testified that Lee's DNA was present on the camera. Spata testified that the serial number of the Nest camera box in Lee's apartment matched the serial number of the Nest camera found in Mills's apartment. Spata also testified that he reviewed the results of a search warrant from Google concerning the Nest camera, which revealed two videos, one which depicted Mills's apartment from underneath a piece of furniture, and another that depicted Lee's apartment from above a doorway.

Nicholas Boffi ("Boffi"), a former detective with the FCPD, testified as an expert in digital forensics. He analyzed Mills's laptop and found key-logging software was last used on April 18, 2017. He also examined hard drives and USB drives that had been seized from Lee's apartment, locating the same key-logging software on one of Lee's USB drives. Boffi opined that Lee's USB drive had been connected to Mills's laptop on July 2, 2016.[10] Boffi also testified that Lee's hard drive contained photos of Mills's apartment locks and of a June 27, 2016 breakup letter that Mills had written to Lee but had never given him.

Cory Gaddis, a custodian of records from Google, testified that Lee's Google account search history showed him searching Google for "nest camera." Kelly Clemens, the property manager at Lee's apartment complex, confirmed that Lee had lived in Apartment 435 since August 29, 2016. She testified that the complex required the use of a key fob to get in and out of the apartment building and that the parking garage was equipped with security cameras. She authenticated a video showing Lee's silver sedan entering the garage at 8:35 p.m. on October 21,

---

[10] Boffi also located a password-cracking software program called "Ophcrack" on one of Lee's USB drives, but Boffi could not find any evidence that the software was used. It is a "Windows password cracking base program" that "allows for testing the strength of passwords" and launches "appropriate programs to extract and crack password hashes."

- 7 -

2017, and leaving 7 minutes later. Key fob records showed that Lee's key fob entered the apartment building at 8:36 p.m. on the same day and that Lee came in through a back door in the apartment building at 10:28 p.m. that night.

During trial, the Commonwealth sought to introduce Lee's notebook into evidence, to which Lee objected, arguing that the notebook was subject to attorney-client privilege and the work-product doctrine. On May 1, 2023, the trial court held a hearing on whether Lee's notebook was admissible. Lee also submitted a chronology of events in support of the existence of an attorney-client relationship between Lee and Ellis. After taking the matter under advisement, the trial court ruled that an attorney-client relationship existed between Lee and Ellis on October 25, 2017, but held that Lee had not met his burden to show that the journal was attorney-client material or work product. The trial court allowed photographs of the pages of the notebook and the notebook itself to be introduced into evidence, although the physical notebook itself was sealed from the jury. The scanned pages from the notebook admitted into evidence contained Lee's personal observations of the investigative process, including Lee declining to be interviewed by Detective Long, Lee admitting that he had not really gone to Shenandoah to hike the day after the shooting but instead went to Douthat State Park, and that Navy command had never told him not to talk to police.

At the conclusion of the Commonwealth's case, Lee moved to strike the Commonwealth's evidence, which the trial court took under advisement and later denied. In defense, Lee called Robert Garstka as a witness, who testified that he had purchased an upper receiver[11] of a firearm from Lee in July of 2017. At the conclusion of all the evidence, Lee renewed his motion to strike, which the trial court took under advisement and later denied.

---

[11] As McMaster noted, a "main feature of AR type of AR 15-style rifles is that it features a two-part receiver design" and that the upper receiver contains the "barrel assembly" and the "bolt assembly" of the firearm.

The parties began discussing the proposed jury instructions submitted to the trial court. Lee objected to the inclusion of Commonwealth's Jury Instruction 5, which stated that "[i]f a person fails to comply with a search warrant, this creates no presumption that the person is guilty of having committed the crime. However, it is a circumstance which you may consider along with the other evidence." Lee asserted that Jury Instruction 5 would "highlight" his actions in relation to the search warrant for his DNA and that it was not proper because Lee did not "avoid[]" or "physical[ly] struggle" when he did not comply with the search warrant. The Commonwealth responded by stating that it was using "softer" language than that which was found in case law and modeled the instruction after the model instruction regarding flight from the scene of a crime. Lee responded that the language was inapplicable because the facts were not "[s]omeone [who] is trying to get away" or "trying to resist." The trial court overruled Lee's objection and gave the instruction.

Both parties made their closing arguments to the jury, with the Commonwealth requesting an hour for its closing argument. The Commonwealth summarized the evidence for the jury, noting that Mills and Lee broke up in September of 2017, Lee was no longer allowed at Mills's apartment, and the messages between Lee and Scott where Lee did not want Scott around Mills. The Commonwealth highlighted portions of a letter that Lee had written to Mills on May 25, 2016, that had been found as part of the search warrants executed at Lee's apartment where he said that the relationship between Lee and Mills was "just another lost cause" and that "they are the only causes worth fighting for." The Commonwealth highlighted other statements from a September 2017 letter that Lee sent to Mills where Lee said that he was "still filled with regret" over Mills, that Lee's "first instinct is to always fight whether it's verbal or physical," and that Lee said he was "an unstable keg of dynamite." The Commonwealth drew attention to much of

- 9 -

the testimony and evidence previously noted in this opinion but did not refer to or mention the notebook in its closing argument.

In Lee's closing argument, he stressed, among other arguments, the circumstantial nature of the Commonwealth's case and the purported lack of direct physical evidence tying Lee to the scene of the shooting. Near the end of Lee's closing argument, his counsel was the first to mention the notebook, noting that it was "a historical reference of the last several days up to the point that it would be seized" but that it was "not a confession" and that "there [were] no discrepancies" in it.

In its rebuttal closing argument, the Commonwealth focused on Lee's attempts to "control the narrative," as well as referencing several pieces of evidence and the testimony of its witnesses. When referencing Stull's testimony in rebuttal, the Commonwealth argued that Lee's statements to Stull about Lee's whereabouts the night of the shooting "show[] [Lee's] guilt," as well as Lee's attempts to change the way he exited and entered the apartment complex showed that Lee was "concerned with the evidence that will prove his guilt." The Commonwealth also argued that Lee's statements about going to McDonald's twice "show[] his guilt" and that Lee's statements in the notebook "prove[] his guilt" because the notebook shows that Lee was "controlling the narrative" and "detailing the investigation as it's happening." The Commonwealth also noted that the DNA from the Nest camera "proved" that the defendant had placed it in Mills's apartment. After deliberation, the jury returned a unanimous guilty verdict on all charges.

On October 31, 2023, Chief Judge Penney S. Azcarate entered an order stating only that "[p]ursuant to Va. Code § 19.2-154, Judge Randy I. Bellows is assigned to preside over remaining aspects of this case, to include post-trial motions and sentencing." Lee filed several motions after the trial, including a motion to set aside the verdicts, to dismiss, or alternatively

grant a new trial, as well as a motion requesting a new trial "in light of judicial change pursuant to Virginia Code § 19.2-154." On December 6, 2023, Judge Randy Bellows entered an order in the case certifying that he had "familiarized himself with the record of the trial" pursuant to Code § 19.2-154.

On December 15, 2023, the parties argued the motion for a new trial based on the judicial change, with Lee's counsel arguing that there was "no way" that Judge Bellows could become familiar with the trial from the written record without having observed it, and that Lee "had the right, upon the designation of the trial judge who presided from the time of the indictment" to elect whether he wished to be sentenced by a judge or a jury. But Lee's counsel did note, however, that Judge Bellows had "obvious[ly] . . . spent time reviewing this record carefully." Judge Bellows denied the motion for a new trial based on the judicial change, noting that he had "put extensive effort into familiarizing [him]self with the record."[12]

The matter proceeded to a sentencing hearing on January 26, 2024. The trial court received evidence and argument from the Commonwealth, including victim impact statements and testimony from other witnesses. The trial court also received evidence and argument from Lee. After confirming that it had considered "all evidence before the Court," the trial court imposed a total sentence of life in prison plus 48 years of incarceration.[13] Lee appealed.

## II. ANALYSIS

### A. *Standard of Review*

We review questions of statutory interpretation de novo. *Artis v. Commonwealth*, 76 Va. App. 393, 397 (2023). "Whether a person has been deprived of due process is a question of

---

[12] The trial court also denied Lee's motion for to set aside the verdict, to dismiss, or for a new trial.

[13] Lee's sentencing orders were entered on January 31, 2024, but suspended for 90 days.

law we review de novo." *Bragg Hill Corp. v. City of Fredericksburg*, 297 Va. 566, 585 (2019). "The admissibility of evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion." *Jones v. Commonwealth*, 38 Va. App. 231, 236 (2002).

"An appellate court 'review[s] jury instructions to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" *Nottingham v. Commonwealth*, 73 Va. App. 221, 228 (2021) (alteration in original) (quoting *Watson v. Commonwealth*, 298 Va. 197, 207 (2019)). "Whether to give or deny jury instructions 'rest[s] in the sound discretion of the trial court.'" *Hilton v. Commonwealth*, 293 Va. 293, 302 (2017) (alteration in original) (quoting *Cooper v. Commonwealth*, 277 Va. 377, 381 (2009)). "[T]his Court reviews *de novo* whether an instruction 'accurately states the relevant law.'" *Ducharme v. Commonwealth*, 70 Va. App. 668, 674 (2019) (quoting *Sarafin v. Commonwealth*, 288 Va. 320, 325 (2014)).

B. *The admission of the notebook in evidence violated Lee's attorney-client privilege, but the error was harmless.*

Lee contends that the trial court erred in admitting the notebook because it was subject to attorney-client privilege, or alternatively, the work-product doctrine. We agree but find the error to be harmless.

1. Admission of the notebook violated Lee's attorney-client privilege.

"Except as may be provided by statute, the existence and application of the attorney-client privilege in Virginia, and the exceptions thereto, are governed by the principles of common law as interpreted by the courts of the Commonwealth in the light of reason and experience." Va. R. Evid. 2:502. "Confidential communications between attorney and client made because of that relationship and concerning the subject matter of the attorney's employment 'are privileged from disclosure, even for the purpose of administering justice.'"

- 12 -

*Commonwealth v. Edwards*, 235 Va. 499, 508-09 (1988) (quoting *Grant v. Harris*, 116 Va. 642, 648 (1914)). Because "the privilege is an exception to the general duty to disclose," it must be "strictly construed." *Id.* at 509. "The proponent has the burden to establish that the attorney-client relationship existed, that the communications under consideration are privileged, and that the privilege was not waived." *Id.*

The attorney-client privilege attaches "to a document even if the document does not contain, or is not accompanied by, a written request for legal advice, if the proponent of the privilege sustains its burden of proof to show that the document was prepared with the intention of securing legal advice on its contents." *Va. Elec. & Power Co. v. Westmoreland-LG&E Partners*, 259 Va. 319, 325 (2000). "The objective of the attorney-client privilege is to encourage clients to communicate with attorneys freely, without fearing disclosure of those communications made in the course of representation, thereby enabling attorneys to provide informed and thorough legal advice." *Walton v. Mid-Atlantic Spine Specialists, P.C.*, 280 Va. 113, 122 (2010). The attorney-client privilege "belongs to the client and not to the attorney." *Edwards*, 235 Va. at 509.

Here, Lee's notebook meets the requirements for being protected from disclosure by the attorney-client privilege. First, the creation of the notebook was "because of th[e] [attorney-client] relationship" between Ellis and Lee. *Id.* at 508-09. Before meeting with Ellis, there is no indication in the record that Lee was writing down his personal observations of the ongoing investigation. It was only after Lee's initial contact with Ellis on October 25, 2017, that Lee began writing down his impressions and recollections of the investigation. Although Ellis never explicitly commanded Lee to create a notebook and write down in it a timeline of the investigation but rather told him to "build a timeline on . . . where he might have been during the time of the shooting," a document is privileged if the client is seeking legal advice on the

- 13 -

contents of the document, not that the attorney explicitly directed the client to produce it. *See*

*Va. Elec. & Power Co.*, 259 Va. at 325. In addition to creating the notebook after speaking with

Ellis, Lee also brought the notebook with him when he met with Ellis a week later and the two

discussed the investigation. Accordingly, the record demonstrates that the notebook "was

prepared with the intention of securing legal advice on its contents" and therefore was made

because of Lee's attorney-client relationship with Ellis. *Id.*

In addition, the notebook contained information that "concern[ed] the subject matter of

the attorney's employment." *Edwards*, 235 Va. at 508-09. Lee contacted Ellis on October 25,

2017, after becoming a person of interest in a shooting investigation. Ellis clarified that the

purpose of his representation was for the investigation and not for any potential criminal charges.

Hence, the trial court correctly found that an attorney-client relationship existed on October 25,

2017, because of Ellis's representation agreement, which stated that Ellis would provide Lee

with representation during the investigation into the shooting of J.T. *See Johnson v. Hart*, 279

Va. 617, 625 (2010) ("It is the contract formed between an attorney and a client that gives rise to

the attorney-client relationship."). Even though Ellis directed that Lee build a timeline of where

he was *prior* to the shooting and Lee's notebook focuses on the events of the investigation *after*

the shooting, the investigation after the shooting was the subject matter for which Ellis had been

retained. Accordingly, we find that the notebook concerned the subject of Ellis's employment,

and its contents were protected from disclosure under the attorney-client privilege.[14]

---

[14] Having determined that the admission of the notebook violated Lee's attorney-client privilege, we do not reach his claim that the admission of the notebook violated the work-product doctrine, as we decide cases "on the best and narrowest grounds available." *Commonwealth v. White*, 293 Va. 411, 419 (2017).

2.  The error in admitting the notebook was harmless.

We cannot reverse a conviction "[w]hen it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached."  Code § 8.01-678.  "'The harmless-error concept is no mere prudential, judge-made doctrine of appellate review[,]' but rather, represents 'a legislative mandate . . . [that] limits the adjudicatory power of Virginia appellate courts.'"  *Shaw v. Commonwealth*, 304 Va. 217, 234 (2025) (alterations in original) (quoting *Commonwealth v. White*, 293 Va. 411, 419 (2017)).  "[I]t is not enough for an appellant to demonstrate that a trial court [may have] erred; to be entitled to relief, he must demonstrate that [any alleged] error was significant enough to merit reversal."  *Id.* (second and third alterations in original) (quoting *Welsh v. Commonwealth*, 304 Va. 118, 140 (2025)).

"A non-constitutional error is deemed harmless when we 'can conclude that the error did not influence the jury or had but slight effect.'"  *Id.* (quoting *Commonwealth v. Kilpatrick*, 301 Va. 214, 216 (2022)).  "In a criminal case, we must be able to conclude that if the error had not occurred, the jury still would have convicted the defendant."  *Id.*  This means that "the evidence of guilt must be so overwhelming that it renders the error insignificant by comparison." *Kilpatrick*, 301 Va. at 217.

Lee asserts that the admission of the notebook was not harmless error because it provided additional details into the events that the Commonwealth had admitted into evidence, and because of the Commonwealth's statement in rebuttal that the notebook "proves" Lee's guilt. Considering the notebook in the context of the trial, we conclude that the admission of the photographs of its pages and of the notebook itself was, at most, harmless error.  *See Shaw*, 304 Va. at 235-36 (placing the evidence at issue in that case "into the context of the trial" and not reviewing the evidence "in a vacuum"); *Commonwealth v. Swann*, 290 Va. 194, 201 (2015)

- 15 -

(finding that harmless error did not apply because "in closing argument, the Commonwealth made clear the importance of the content of the tip by arguing that it was one of the prosecution's 'most important[]' pieces of evidence" (alteration in original)).

Here, when viewed in the context of the entire trial, the notebook played only a small part in the Commonwealth's case. Here, the jury convened on April 25, 2023, and began final deliberations on May 10, 2023, receiving over 300 exhibits and hearing from dozens of witnesses during that period. The Commonwealth's initial closing argument was estimated to require an entire hour.[15] During that initial closing argument, the Commonwealth referred to *other* writings in support of a conviction, primarily a letter from Lee that was dated May 25, 2016, as well as a letter from September of 2017. The Commonwealth noted that Lee's language throughout the letter indicated his state of mind, emphasizing that Lee's "first instinct is to always fight whether it's verbal or physical." The Commonwealth further argued that Lee was "still filled with regret" over Mills and that Lee described himself as "an unstable keg of dynamite." The Commonwealth further argued that even as late as four days before the shooting, Lee stated that he was "lost" without Mills and that he "still love[d] her." The Commonwealth further detailed the other circumstantial evidence in the case, including but not limited to evidence from Lee's key fob, which showed him leaving his apartment an hour before the shooting and coming back in through a side door at 10:28 p.m. that night. There was also evidence that on the night J.T. was shot, Mills did not hear gunfire, which was consistent with the use of a suppressor, an item Lee owned.

Throughout the entirety of the Commonwealth's initial closing argument, it never referenced the notebook or any of its contents. *See White*, 293 Va. at 423 (finding any error to be

_____

[15] The record notes that the jury returned at 1:01 p.m. and was instructed on the law in the case. Afterwards, the transcript states that the Commonwealth concluded its closing argument at 2:15 p.m.

- 16 -

harmless where the prosecutor did not mention the evidence in "his opening or closing statements" but focused on other evidence).  It was not until well into Lee's own closing argument that Lee first referenced the notebook, describing it as "a historical reference of the last several days up to the point that it would be seized."  Lee noted during closing that the notebook was "not a confession" and that "there [were] no discrepancies" in it.  Only in rebuttal, did the Commonwealth use variations of the phrase "[i]t proves his guilt" numerous times throughout its argument as a rhetorical device in response to Lee raising the issue first.  In fact, when it mentioned the notebook, the Commonwealth only argued that it proved that Lee is "controlling the narrative" and "detailing the investigation as it's happening."  Hence, in the context of the entire trial, the notebook, at best, "had marginal 'importance . . . in the prosecutor's case.'"  *White*, 293 Va. at 423 (quoting *Angel v. Commonwealth*, 281 Va. 248, 264 (2011)); *see Castillo v. Commonwealth*, 70 Va. App. 394, 431 (2019) (finding any assumed error in admitting potential attorney-client privileged information harmless because "it was counsel for appellant who first raised the notes in closing argument" and "[t]he Commonwealth mentioned the notes only in passing during its rebuttal closing").  The central issue to be determined in this case was the identity of the individual who shot J.T., as Lee noted that he was not contesting the severity of J.T.'s injuries.  Certainly, statements from the defendant that corroborated the testimony of the investigators would demonstrate consistency with the Commonwealth's narrative of the case.  But none of the information in the notebook was pertinent to any of Lee's actions before the shooting.  It served as a means by which he could form a chronology of the events of the investigation and record some of his own personal observations.

In summary, nearly all the evidence relied upon by the Commonwealth in its case-in-chief and closing argument had nothing whatsoever to do with the notebook or its contents.  Rather, the hundreds of exhibits and multiple witness accounts established that Lee engaged in

repeated stalking behaviors towards Mills, invaded Mills's personal privacy by placing a camera in her apartment without her consent, and obtained passwords and other private electronic information. Moreover, Lee remained territorial concerning other men in Mills's life even after Mills had ended the relationship a second time. The record also demonstrates that Lee gave multiple inconsistent and improbable statements about his whereabouts during the events of the shooting, failed to comply with a search warrant for his DNA, and conducted extensive planning and sophisticated coordination of his crimes, used a suppressor to mask the sound of gunfire, and changed the method by which he returned to his apartment so that "they'll see him leaving, but they won't see him return." Hence, we conclude that the circumstantial evidence of Lee's guilt overwhelmingly proved the Commonwealth's case such that the evidence of Lee's guilt "render[ed] the error insignificant by comparison." *Kilpatrick*, 301 Va. at 217; *see Finney v. Commonwealth*, 277 Va. 83, 89 (2009) ("While no single piece of evidence may be sufficient, the combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion."). Accordingly, when viewed in the context of the entire case and the elements of the offenses, the notebook had only "slight effect" on the jury's decision to convict Lee. *Shaw*, 304 Va. at 234. Thus, we find the trial court's error in admitting the notebook to be harmless.[16]

---

[16] Our conclusion in no way endorses the Commonwealth's handling of the privileged information in this case, where a lone prosecutor instructed law enforcement to seize the notebook and review its contents even after Ellis informed law enforcement that Lee was represented and the notebook was privileged. Alternatives to this course of action include using a "privilege team" or "taint team" when reviewing potentially privileged information, *United States v. Jackson*, No. 07-0035, 2007 U.S. Dist. LEXIS 80120, at *5 (D.D.C. Oct. 30, 2007), and *in camera* review by the court, which did not occur until the middle of trial. *See Pereira v. Commonwealth*, 83 Va. App. 431, 445-46 (2025); *Citizens of Fauquier Cnty. v. Town of Warrenton*, 81 Va. App. 363, 388 (2024) (noting that *in camera* review has been encouraged by the Virginia Supreme Court and that the process is used "routinely"). Nevertheless, these matters are not before us and our harmless error mandate dictates that we affirm Lee's convictions.

C. *It was not error for Judge Bellows to preside over Lee's post-trial motions and sentencing hearing.*

Lee next asserts that the trial court abused its discretion by appointing Judge Bellows to preside over the post-trial motions and sentencing hearing in his case, because Judge Bugg had resumed at least some of his judicial duties by the time that the resolution of Lee's post-trial motions and sentence were heard. We disagree.

Code § 19.2-154 states in part that if

> by reason of [death, sickness or other] disability, the judge who presided at any trial is unable to perform the duties to be performed by the court after a finding of guilty by the jury or the court, another judge of that court . . . may perform those duties or, in his discretion, may grant and preside at a new trial. Before proceeding with the trial or performing such duties, such judge shall certify that he has familiarized himself with the record of the trial.

"[T]he general rule of statutory construction is to infer the legislature's intent from the plain meaning of the language used." *Hillman v. Commonwealth*, 68 Va. App. 585, 592-93 (2018) (quoting *Meeks v. Commonwealth*, 274 Va. 798, 802 (2007)).

Here, Judge Bellows was assigned on October 31, 2023, and did not enter any orders in the case until December 6, 2023, when he certified that he was familiar with the case. This was not an empty statement of familiarity but one supported by the record. Indeed, Judge Bellows noted that he had "put extensive effort into familiarizing [him]self with the record." Even counsel for Lee remarked on the trial court's preparedness, stating that "it's obvious, [the trial court] has spent time reviewing this record carefully."

Furthermore, under the plain language of the statute, the service of the substituted judge does not automatically conclude simply because the original trial judge is handling other matters. If the General Assembly intended for the conclusion of temporary disabilities to allow for the reinstatement of the original judge, it could have done so. Moreover, at the time an original circuit judge is removed from a case, it is not always possible to foresee the duration, extent, or

- 19 -

severity of the situation that led to the original judge being removed. Hence, a judicially-imposed procedure requiring reinstatement as advocated by Lee is both unworkable as well as inconsistent with the plain meaning of the statute. Accordingly, since the record reflects that Judge Bellows certified that he was familiar with the record in the case before presiding during the sentencing hearing and hearing on the post-trial motions, there was no error in him doing so pursuant to Code § 19.2-154. In addition, there was no error when Chief Judge Azcarate assigned Judge Bellows to preside during either the post-trial motions or sentencing hearing of Lee.

In addition to the alleged error based upon failing to comply with the statute, Lee contends that his constitutional due process rights were violated because he had previously elected to be sentenced by a judge under Code § 19.2-295 and made that election with the expectation that Judge Bugg would preside during the sentencing hearing. We disagree.

"[A]lthough the accused may waive his right to trial by jury, he has no corresponding right to be tried by a judge." *Richardson v. Commonwealth*, 67 Va. App. 436, 442-43 (2017). A "defendant has no vested right to have his case tried before any particular judge." *Anderson v. Commonwealth*, No. 0993-22-2, slip op. at 7 (Va. Ct. App. Oct. 17, 2023) (quoting *Anderson v. State*, 327 P.3d 89, 95 (Wyo. 2014)).[17] And a defendant likewise does not have a constitutional due process right to be sentenced by the trial judge who oversaw their trial. *See United States ex rel. Fields v. Fitzpatrick*, 548 F.2d 105, 107 (3d Cir. 1977) (holding that "[n]o other court has held that there is such a right under the United States Constitution"); *United States v. Whitfield*, 874 F.2d 591, 593 (8th Cir. 1989) ("A defendant's due process rights are not infringed by the reassignment of a case pursuant to Rule 25(b) following a finding or verdict of guilt.").

---

[17] "Although not binding precedent, unpublished opinions can be cited and considered for their persuasive value." *Otey v. Commonwealth*, 61 Va. App. 346, 350 n.3 (2012); *see* Rule 5A:1(f).

Although no case in Virginia has addressed this issue directly, our case law involving substitution of judges after the trial demonstrates that such substitution will be upheld if the sentencing judge becomes familiar with the entire record before sentencing, similar to the procedure in federal courts. *See Whitfield*, 874 F.2d at 593 ("A successor judge need only familiarize himself with the evidence and legal issues involved and exercise informed discretion in imposing sentence."); *Grandison v. Commonwealth*, No. 1472-04-4, slip op. at 6 (Va. Ct. App. Oct. 25, 2005) (declining to apply the ends of justice exception to Rule 5A:18 where "Judge Wetsel, at the time of sentencing, was familiar with the underlying circumstances of Grandison's conviction" and with the facts of the case); *see also Lynch v. Commonwealth*, 39 Va. App. 89, 95 (2002) (upholding the changing of judges under Code § 17.1-503); *Fogg v. Commonwealth*, 215 Va. 164, 167-68 (1974) (finding that there was "no merit in defendant's argument that he was erroneously sentenced because one judge originally found him guilty and another judge subsequently resentenced him" because the record demonstrated that the sentencing judge considered all the evidence in the record before imposing the sentence).

Here, Lee's constitutional due process rights were not implicated by Judge Bellows presiding over Lee's post-trial motions and sentencing. As noted above, Judge Bellows certified that he had become familiar with the details of the case including Lee's motions. In fact, Judge Bellows described his reasoning for ruling on each of the motions on the record. Similarly, Judge Bellows indicated when crafting a sentence following the sentencing hearing that he had read the victim impact statements and heard from multiple witnesses that gave mitigating and aggravating factors for the trial court's consideration. Only after considering the evidence and the law did Judge Bellows impose a sentence that was within the statutory maximum for each offense. Once again, he described his reasons for doing so based upon the evidence. Hence, Lee's sentencing hearing was held consistent with principles of fairness and due process.

Thence, Lee's due process rights were not violated as a result of Judge Bellows presiding over Lee's post-trial motions and sentencing hearing.

   D. *The trial court did not err in admitting evidence of Lee's refusal to submit to the search warrant for his DNA or instructing the jury of the same.*

Lee next contends that the trial court should not have admitted evidence of Lee's refusal to submit to the search warrant by providing a sample of his DNA because the failure to comply was not evidence of Lee's consciousness of guilt. We disagree.

"Evidence relating to a point properly at issue in a case is relevant and, therefore, admissible if it has 'any logical tendency, however slight,' to establish that point." *Church v. Commonwealth*, 71 Va. App. 107, 123 (2019) (quoting *Ragland v. Commonwealth*, 16 Va. App. 913, 918 (1993)). "The scope of relevant evidence in Virginia is quite broad, as '[e]very fact, however remote or insignificant, that tends to establish the probability or improbability of a fact in issue is relevant.'" *Commonwealth v. Proffitt*, 292 Va. 626, 634 (2016) (alteration in original) (quoting *Va. Elec. & Power Co. v. Dungee*, 258 Va. 235, 260 (1999)). "[I]t is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct are admissible as evidence of consciousness of guilt, and thus of guilt itself." *Langhorne v. Commonwealth*, 13 Va. App. 97, 102 (1991); *see Palmer v. Commonwealth*, 14 Va. App. 346, 349 (1992) ("[R]efusal to comply with the court order was a circumstance tending to show guilt and was properly considered by the trier of fact.").

Here, Lee bases his argument that the trial court erred in admitting his refusal to comply with the search warrant on *Haas v. Commonwealth*, a case where the defendant had to be physically forced to comply with a search warrant for his DNA. 71 Va. App. 1, 15 (2019), *aff'd in part, vacated in part by Haas v. Commonwealth*, 299 Va. 465 (2021). Lee asserts that because his conduct did not rise to the level of the defendant's actions in *Haas*, the trial court erred in

- 22 -

admitting his refusal here.  But, as noted above, the bar for the admission of relevant evidence is a low one, as even a "slight" tendency to establish a point—here, consciousness of Lee's guilt—renders the evidence admissible.  *Church*, 71 Va. App. at 123; *Proffitt*, 292 Va. at 634.  Although the facts in *Haas* involved a refusal that culminated in law enforcement forcibly requiring that defendant's compliance, this does not mean that there is a requirement in our case law that refusing to comply with a search warrant must be egregious or combative to warrant the admission of that evidence at trial.  Indeed, in *Palmer*, where this Court upheld the admissibility of a defendant's refusal to comply with a court's order for the defendant to cut his hair and shave his beard to participate in a witness line-up, there is no indication that the defendant there physically resisted to the level of the defendant in *Haas*.

Furthermore, Ellis had previously "told [Lee] at some point he's likely to be subject to a search warrant."  This was similar to *Haas*, where evidence of the defendant's refusal was admissible where the judge put the defendant on notice that the defendant had to comply with the search warrant for his DNA.  71 Va. App. at 18-19.  Accordingly, despite Lee's refusal to comply with the search warrant being less egregious than it could have been, the trial court did not abuse its discretion in admitting the evidence, as it was relevant to establish Lee's guilt.[18]

---

[18] Lee argued on brief to this Court that the admission of this evidence violated Virginia Rule of Evidence 2:403, and asserts that this objection was preserved below by his arguments in his post-trial motion to set aside the verdict, to dismiss, or alternatively for a new trial, where he argued that he was "prejudiced by the allowance" of the testimony regarding the DNA search warrant, and where he argued that the "evidence was not relevant" and that Lee was "prejudiced by th[e] admission of the 'refusal' evidence."  We note that Lee has not assigned error to the trial court's denial of this motion, *see* Rule 5A:20, and that our case law has held that "[m]aking one specific argument on an issue does not preserve a separate legal point on the same issue for review."  *Hargrove v. Commonwealth*, 77 Va. App. 482, 504 (2023) (quoting *Edwards v. Commonwealth*, 41 Va. App. 752, 760 (2003) (en banc)).  Because the argument on brief invokes Rule 2:403 and the argument below only challenged the relevance of the prejudicial evidence, we do not address Lee's argument involving Rule 2:403 on appeal.  *See* Rule 5A:18.

Lee further asserts that it was error for the trial judge to give an instruction to the jury regarding the limited purpose for which the jury could consider his refusal to comply with the search warrant because it improperly "highlighted" the refusal to comply with the search warrant. Lee also asserts that the jury should not have been instructed regarding his failure to comply because he should have been afforded the opportunity to confer with his attorney before complying with the search warrant for his DNA. We disagree.

An instruction is "viewed in the light most favorable to the proponent," *Nottingham*, 73 Va. App. at 228, and must be supported by "more than a scintilla of evidence," *Turman v. Commonwealth*, 276 Va. 558, 564 (2008). "An instruction that refers to specific evidence does not automatically amount to an improper emphasis, as long as the instruction does not suggest that the specific evidence compels a particular finding." *Nottingham*, 73 Va. App. at 230.

Here, when viewed in the light most favorable to the Commonwealth, there is more than a scintilla of evidence in the record to support the trial court giving the instruction. The Commonwealth's proposed instruction stated that "[i]f a person fails to comply with a search warrant, this creates no presumption that the person is guilty of having committed the crime. However, it is a circumstance which you may consider along with the other evidence." The Commonwealth's evidence showed that Detective Long attempted to execute a search warrant for Lee's DNA on January 10, 2018, but that Lee was "disinterested" and "declined to provide" a DNA sample until 12 days later. Accordingly, the record contains more than a scintilla of evidence to demonstrate that Lee failed to comply with the search warrant for his DNA.

Furthermore, the instruction was an accurate statement of law. As noted above, refusal to comply with a court order is admissible evidence. *See Langhorne*, 13 Va. App. at 102 (noting that evidence of an accused's "resistance to arrest, concealment, . . . and related conduct" is admissible as "evidence of consciousness of guilt, and thus of guilt itself"); *Palmer*, 14 Va. App.

at 349 ("Resistance to the court order suggests an attempt at concealment."). But it does not by itself create any presumption of a defendant's guilt, as it is only one piece of evidence in the Commonwealth's case. *See Anderson v. Commonwealth*, 100 Va. 860, 863 (1902) (noting that evading prosecution is "a circumstance to be considered by the jury along with the other facts and circumstances tending to establish the guilt of the accused"); *Finney*, 277 Va. at 89 ("[T]he combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion."). The instruction likewise did not improperly highlight the evidence to the jury. The language in the instruction mirrored that of the instructions for flight from the scene of a crime, where the jury is instructed that it can consider such evidence but that it is not presumptively establishing anything else in the jury's consideration of the case. *See Cheripka v. Commonwealth*, 78 Va. App. 480, 493 (2023) (upholding the use of a jury instruction which stated that "[i]f a person leaves the place where a crime was committed to avoid prosecution, detection, apprehension, or arrest, this creates no presumption that the person is guilty of having committed the crime. However, it is a circumstance which you may consider along with the other evidence"). Giving this instruction in no way infringes upon the ability of the jury, acting as the factfinder, to evaluate the reasonableness of Lee's response and give it minimal or no weight considering the entirety of the circumstances. As noted in the language of the proposed instruction, Lee's failure to comply with the search warrant for 12 days "create[d] no presumption" that he was guilty, but it was "a circumstance which [the jury] may consider along with the other evidence." Thus, "the instruction does not suggest that the specific evidence compels a particular finding." *Nottingham*, 73 Va. App. at 230. Therefore, the instruction was an accurate statement of law and did not improperly highlight any evidence for the jury.

Accordingly, since there was more than a scintilla of evidence to support giving the instruction and the jury instruction was an accurate statement of law, the trial court did not err in instructing the jury.

## III. CONCLUSION

In light of the overwhelming circumstantial evidence of Lee's guilt, the admission of the notebook—which only chronicled the events of the investigation *after* that date—was error that was harmless to the ultimate result because the admission of the notebook in evidence only had a slight effect on the jury. In addition, Judge Bellows certified that he was familiar with the trial record and also demonstrated his familiarity with that record through his careful and extensive rulings involving Lee's sentencing and post-trial motions, neither of which is challenged on appeal. Furthermore, the admission of evidence of Lee's failure to comply with the search warrant was relevant to his guilt and the jury was correctly instructed on the effect of his refusal. For these reasons, we affirm Lee's convictions.

*Affirmed.*